**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-0389-TNM** |
| **v.** | : | |
| | : | |
| **JOSHUA RYAN DALE,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. The defendant, Joshua Ryan Dale, pleaded guilty to a Class A misdemeanor, a violation of 18 U.S.C. § 1361 (destruction of government property) (Count One).

For the reasons set forth herein, the government requests that this Court sentence Dale to 6 months' incarceration. Additionally, the government requests that this Court sentence Dale to 12 months of supervised release, a $25 special assessment, and, consistent with the plea agreement in this case, $1000 in restitution.

## I. Introduction

Defendant Joshua Ryan Dale, a 33-year-old resident of Tennessee and owner of a tile installation and remodeling business, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential

election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Dale pleaded guilty to a violation of 18 U.S.C. § 1361. As explained herein, the government's recommendation is supported by (1) Dale's knowing participation in the dangerous crowd of rioters that amassed outside the Senate Wing doors to the Capitol building, (2) his entry into the Capitol building only minutes after other rioters violently breached those doors, (3) his violent and destructive behavior inside the Capitol when he damaged Capitol property by slamming a large historical marker against an interior door, and (4) his repeated and brazen refusal to comply with court-imposed supervision throughout his months of pretrial release in this case.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of the crime support sentence of 6 months' incarceration, as well as 12 months' supervised release, $1000 in restitution, and a $25 special assessment.

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II. Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense, ECF 1-1, at 2-3.

*Dale's Roles in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Dale attended a rally at the National Mall in Washington, D.C. with five other individuals with whom he had travelled to protest the Congressional certification of the 2020 presidential election. He knew that Congress was in session that day for that purpose.

After the rally concluded, Dale and his travelling companions moved toward the Capitol building. Once there, the defendant continued up the West Front of the Capitol toward the building in a crowd of fellow rioters.

When he reached the police line at the base of the Capitol building, he joined others in climbing on and through the scaffolding that had been erected for the upcoming inauguration. While climbing through the scaffolding he recorded a video which was later obtained during a search of his cellular telephone. In the video he narrated and proclaimed, "Taking it by storm, boys. Busting down the gates." He also took a selfie photograph of himself while in the scaffolding. Figure 1.



*Figure 1 – A selfie photograph taken by DALE on the West Front of the Capitol building in the scaffolding.*

Dale then attempted to advance by ascending the Northwest steps that lead from the West Plaza to the Upper Northwest Terrace. As Dale ascended the stairs he was near the very front of the rioters. In a still image from a video shot by another rioter that day, Figure 2, Dale is circled in red and is seen wearing the same hooded jacket and beanie cap.




*Figure 2 – Still image of DALE (circled in red) ascending the Northwest Steps toward the Capitol building*

When the rioters got to the top of the steps, they forced their way around another police line and flooded the Northwest Terrace. Dale, circled in red in a still image of a separate video

taken by a different rioter that day, was one of the first few dozen rioters to breach that line and reach the Northwest Terrace.




*Figure 3 – still image of DALE (circled in red) on the Upper Northwest Terrace of the Capitol*

At approximately 2:13 p.m., the defendant entered the Capitol building through the Senate Wing Door, less than one minute after the door was breached by other rioters. Figure 4. Of particular note, this breach of the Capitol building was the very first breach that day. At the time the defendant entered the building there was an audible alarm that was sounding and there was broken glass on the floor from windows which had been shattered. The defendant was aware at the time he entered the Capitol building that he did not have permission to enter, not only because of the blaring alarm and broken glass, but also because he was there at the Upper Northwest Terrace when the door was breached.




*Figure 4 - DALE (red arrow) entering the U.S. Capitol building at the Senate Wing Door*

After he entered the building, the defendant turned to his right and walked down the hallway toward the Crypt. He then returned a few minutes later to the hallway inside the Senate Wing Door, where he and another rioter picked up a wooden historical marker. They then used the marker as a battering ram and thrust it against an interior door in the hallway. Figures 5 and 6. The marker was government property and was damaged by the defendant and his fellow rioter as they smashed it against the door.




*Figure 5 - DALE (in yellow box) before picking up marker in front of him*



*Figure 6 -DALE picking up marker (in yellow box) before smashing it against an interior door*

After dropping the historical marker, Dale walked north from the Senate Wing Door hallway, then east within the building travelling beneath the Senate Chambers until he exited the building out of the Senate Carriage Door on the east side of the Capitol. Figure 7.




*Figure 7 - DALE (red arrow) exiting the Capitol building out of the Senate Carriage Door*

*The Charges and Plea Agreement*

On August 26, 2024, the United States charged Dale in a 6-count Information with violating 18 U.S.C. § 1361, 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 18 U.S.C. § 1752(a)(4), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104 (e)(2)(G). On October 25, 2024, pursuant to a plea agreement, Dale pleaded guilty to Count 1 of the Information, charging him with a violation of 18 U.S.C. § 1361. By plea agreement, Dale agreed to pay $1,000 in restitution to the Architect of the Capitol.

## III. Statutory Penalties

Dale now faces sentencing for violating 18 U.S.C. § 1361. As noted by the plea agreement and the U.S. Probation Office, Dale faces up to 12 months of imprisonment and a fine of up to $100,000. Dale must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## IV. The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall,* 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B1.1(a)(2) | 6 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

The U.S. Probation Office calculated Dale's criminal history as a category III. PSR at ¶ 54. The U.S. Probation Office calculated Dale's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0-6 months PSR at ¶ 116. Dale's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh strongly in favor of a sentence of 6 months' incarceration for Dale.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Dale's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Most notably, unlike the vast majority of misdemeanor defendants seen by the Court, Dale pleaded guilty to committing a violent and destructive act while he was a member of the mob which entered the Capitol building.

One additional significant factor in Dale's case is the timing and location of where he entered the Capitol building – at the initial breach-point of the building at the Senate Wing Door

and within a minute of when it was first breached. His violent and destructive acts in that moment and at that location helped to normalize the violence and destruction that followed and further fueled the mob. Accordingly, the nature and the circumstances of this offense establish the clear need for a substantial sentence of incarceration and subsequent supervision in this matter for Dale.

B. **Dale's History and Characteristics**

Dale is a thirty-three-year-old resident of Tennessee who owns and operates a tile installation and remodeling company. PSR ¶¶ 60, 94. As noted in the Presentence Report, Dale has sustained numerous arrests and convictions, and has previously failed to abide by the terms of Court-ordered probation. Dale's arrests and convictions include:

- In April of 2013 Dale was arrested and later convicted of Driving While Intoxicated. He was sentenced to a one-year sentence with all but seven days suspended, but later violated his probation and was sentenced to 12 months of custody. PSR ¶ 50.
- In May of 2014 Dale was arrested and later convicted again of Driving While Intoxicated. He was sentenced to a two-year suspended sentence but later violated his probation and was sentenced to 2 years of custody. PSR ¶ 51.
- In October of 2015 Dale was arrested and later entered a prayer for judgment to Larceny. PSR ¶ 52.
- In July of 2020 Dale was charged with Assault on a Female, though the case was later dismissed. PSR ¶ 56.
- In April of 2021 Dale was arrested and later convicted of Possession of Drug Paraphernalia and sentenced to 12 months unsupervised probation. PSR ¶ 53.

In this case Dale repeatedly, brazenly, and intentionally violated court-ordered supervision over a seven-month period of time, culminating in this Court revoking his pretrial release on October 25, 2024. *See* ECF No. 12, ECF No. 16, ECF No. 18, ECF No. 21, ECF No. 27, ECF No. 32, ECF No. 33, and ECF No. 34.

During the seven months he was on pretrial release, Dale violated no less than ten separate conditions of his pretrial release, most of which he violated on multiple occasions. He violated the reporting requirement, the address condition, the drug testing condition, the condition prohibiting the use of controlled substances, the firearms/weapons condition, the condition requiring truthfulness with Pretrial Services, the medical/psychiatric treatment condition, the curfew condition, the substance abuse therapy and counseling condition, and the mental health assessment and treatment condition. The culmination of this abysmal record of non-compliance was his final text message to his supervising officer on October 2, 2024 - "I wish yaw would just leave me alone. I don't know, yaw, don't want to know yaw".

Dale's crime on January 6 was not an isolated event in an otherwise law-abiding life. Dale's criminal history, his abysmal performance on pretrial release in this case, and his previous violations of probation conditions collectively demonstrate a significant lack of personal accountability for his actions or respect for the law. Dale's history and characteristics, including his history of arrest and conviction and his performance on pretrial release, weigh heavily in favor of the recommended term of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America

America, and that's the peaceful transfer of power."). Further, this case is more aggravating than many other misdemeanor cases given the violence used and the destruction caused by Dale.

**D. The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by these defendants. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." Statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37.

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider. Here, the defendant has acknowledged that he understood that Congress was in session on January 6, 2021, in order to certify the 2020 presidential election, and he was among the first rioters to unlawfully enter the U.S. Capitol building that day. PSR ¶¶29-30; Statement of Offense 3-4.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this defendant also weighs in favor of a significant term of incarceration. Dale did not just enter the Capitol building with the

rioters; he entered and committed an additional crime by damaging government property he found there. Moreover, his destruction of that property took place while he attempted to smash in an interior door of the Capitol building not knowing what, or who, might be behind that door. In an already volatile and dangerous situation, the defendant's actions further escalated the chaos and lawlessness inside the Capitol.

Further, although Dale ultimately accepted responsibility by pleading guilty in this case, his post-January 6 conduct is troubling. While under court supervision he almost continuously violated the conditions of his release, often intentionally. He lied to his Pretrial Services officer, neglected to take actions required by his release order, and flatly refused to comply with directives from the officer. And he did so not once or twice but on countless occasions. Even with a court hearing pending on the revocation of his pretrial release he continued to violate the conditions of his release, resulting in a seventh and final violation report being filed with this Court only two days before his hearing on October 25, 2024.

Likewise, Dale has not taken steps to denounce his words and actions on January 6, 2021, including to the Probation officer who conducted his PSR interview. PSR ¶ 37. The Court should view any remorse Dale expresses at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged over a thousand individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors to assault on police officers and other felony crimes.[2] This Court must sentence Dale based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Dale has pleaded guilty to Count One of the Information, for violating 18 U.S.C. § 1361. This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply in this case.

Although each of the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Dylan Cronin,* 22-cr-233-ABJ, ECF No. 85 (Gov't Sentencing Memorandum), the defendant pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1) and one count of violating 18 U.S.C. § 1361, both Class A misdemeanors. Like Dale, Cronin was at the West Front of the Capitol building before the breach of the building, and like Dale he advanced

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

to the Upper Northwest Terrace and entered the building through the Senate Wing Door. Cronin damaged government property before he entered the building, breaking window glass at the Senate Wing Door as he and others attempted to get inside. Cronin was also one of the first rioters to enter the building, although he spent more time inside of the Capitol than Dale and travelled substantially further inside the building (getting as far as the House Main Doors).

Regarding his personal history and in contrast to Dale, Cronin had served successfully for eight years in the U.S. Army Reserves, was in Criminal History Category I, and had not had a single violation reported to the court during the 15 months he was under pretrial supervision before sentencing. Judge Berman Jackson sentenced Cronin to two months of incarceration for violating 18 U.S.C. § 1752(a)(1) and to eight months incarceration for violating 18 U.S.C. § 1361 with the sentences to run concurrently. He was also sentenced to 12 months of supervised release as to each count, to also run concurrently.

In *United States v. Ryan Kelly*, 22-cr-222-CRC, ECF No. 47 (Gov't Sentencing Memorandum), the defendant pleaded guilty to a violation of 18 U.S.C. § 1752(a)(1), though he had also been charged with violating 18 U.S.C. § 1361, among other misdemeanor counts. Like Dale, Kelly was on the West Front of the Capitol in the mob which rushed the Capitol. Like Dale he also damaged government property, in his case tearing a tarp which was covering scaffolding present on the West Front. While Kelly was an active participant in the mob on the West Front for over two hours, unlike Dale he never entered the Capitol building. While Kelly posted to social media after January 6 justifying the rioters acts and minimizing the harm caused, he appeared to have lived an otherwise law-abiding life prior to January 6. He also is not known to have violated the conditions of his pretrial release in the 16 months during which he was supervised. Judge Cooper sentenced Kelly to 60 days of incarceration with one year of supervised release to follow.

In *United States v. Hunter Ehmke*, 21-cr-029-TSC, ECF No. 31 (Gov't Sentencing Memorandum), the defendant pleaded guilty to a felony violation of 18 U.S.C. § 1361. Ehmke committed his criminal acts on January 6 at the East Front of the Capitol building, and damaged property before the Capitol building was breached. He did so by jumping onto a window ledge of the Capitol building and kicking and breaking windowpanes before officers took him to the ground. While Ehmke's acts created a more direct and immediate security concern for officers than did Dale's, Ehmke did not ever enter the building and he is believed to have left the Capitol area after officers informed him that a warrant would be issued for his arrest.

While Ehmke pleaded guilty to a felony § 1361 offense, his Guidelines offense calculation was the same as Dale's calculation is in the present case (as, unlike Dale, Ehmke had no prior criminal convictions and was sentenced in Criminal History Category I). Judge Chutkan sentenced Ehmke to four months of incarceration, to be followed by three years of supervised release.

## VI. Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Dale must pay $1000 in restitution, which reflects the damage he individually caused and also the role he played in the overall riot on January 6. Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Dale's restitution payments must be made to the Clerk of the Court, who will forward the payments to the Architect of the Capitol and other victim entities. *See* PSR ¶ 11.

## VII. Fine

Dale's conviction for violation of 18 U.S.C. § 1361 subjects him to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider each defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the Presentence Report asserts that after a "review of the defendant's financial information, it does not appear that he has the ability to pay a fine." PSR ¶ 114.

## VIII. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Dale to 6 months' incarceration. Additionally, the government requests that this Court sentence Dale to 12 months of supervised release, a $25 special assessment, and, consistent with the plea agreement in this case, $1000 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime both by imposing restrictions on both Dale's liberty as a consequence of his behavior and by providing needed court supervision after release, while also recognizing his acceptance of responsibility for his crimes.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: s/ *Joseph S. Smith, Jr.*
Assistant United States Attorney
CA Bar No. 200108
601 D Street, N.W.
Washington, D.C. 20530
(619) 546-8299
joseph.s.smith@usdoj.gov