UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
|         Plaintiff, | ) | |
| v. | ) | No. 1:24-CR-389-TNM |
| | ) | |
| JOSHUA RYAN DALE | ) | |
|         Defendant. | ) | |

**SENTENCING MEMORANDUM**

Comes the defendant, Joshua Ryan Dale, and files this Sentencing Memorandum, reflecting his position with respect to a sentence that is sufficient but not greater than necessary to achieve the sentencing purposes set forth in 18 U.S.C. §3553(a). Mr. Dale would respectfully request a sentence of time served and a reasonable period of supervised release. The following is offered in support of such request:

**PROCEDURAL HISTORY**

This case originated by a Criminal Complaint filed on March 22, 2024. Doc. 1. Mr. Dale was arrested in the Eastern District of Tennessee five days later. (PSR, p. 1). On April 4, 2024, Mr. Dale was released on his own recognizance in the District of Columbia after appearing via video for an initial appearance. *Id*. His bond was revoked on October 25, 2024, and he was ordered detained, in which status he remains[1]. *Id*.

On August 26, 2024, the United States Attorney for the District of Columbia returned an Information charging Joshua Dale with Destruction of Government Property, in violation of 18

---

[1] Due to his incarcerated status at the DC Central Detention Facility in Washington, D.C. and the difficulties communicating with Mr. Dale, counsel is requesting leave to file one day late after speaking with Mr. Dale today.

1

USC § 1361, as to Count One, the count at issue in Mr. Dale's sentencing, and with four other misdemeanor offenses in Counts Two through Six. *Id*. at p. 5, ¶ 1. On October 25, 2024, Mr. Dale pled guilty to Count One. *Id*. at p. 5, ¶ 4. On this same day, the plea agreement and statement offense were filed. Docs. 35, 36.

## **THE NATURE AND CIRCUMSTANCES OF THE OFFENSE:**

Prior to the 2020 Presidential election, Joshua Dale had never been politically active and did not regularly vote, but he connected with President Trump's message of America First and felt his family would benefit from a Trump presidency. After the election, allegations of fraud and irregularities were swirling and Mr. Dale found merit in these stories. He struggled with the notion that his vote may not have counted and President Trump was unfairly ousted from the White House.

On December 19, 2020, following his loss in the 2020 presidential election, then-President Donald Trump announced a "Save America" rally to protest the election results. *See* Dan Barry and Sheera Frenkel, *'Be There. Will Be Wild!': Trump All but Circled the Date,* The New York Times (Jan. 6, 2021), available at https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html. The rally was set for January 6, 2021, the same date Congress was set to certify Joseph R. Biden, Jr. as the winner of the 2020 presidential election. *See id*.

Mr. Dale did not plan to attend the rally, there are not extensive messages between he and other rioters. He was not active on message boards or Pro-Trump websites. Instead, he was busy working in North Carolina, when a friend asked Mr. Dale if he would ride with him to Washington, D.C.; a decision Mr. Dale desperately regrets.

The speakers at the rally reenforced the concerns about voter fraud and "rigged" elections. One after another, speaker after speaker, the crowd was being worked into a frenzy

by some of the highest level of political leaders in the legislative and executive branches. By the time President Trump took the stage the crowd was at a tipping point. At the president's direction the rally crowd was told to march to the capital and "We fight like hell and if you don't fight like Hell, you're not going to have a country anymore…." Many rally goers began walking to the capital building and Mr. Dale followed.

    Mr. Dale entered the capital through the Senate Wing door at approximately 2:13 p.m. He turned right and briefly walked down the hallway toward the Crypt. Mr. Dale then returned to the Senate Wing Door hallway, where he and another person, picked up a wooden marker and thrust it against an interior door in the hallway. Mr. Dale exited the Senate Carriage doors at approximately 2:17 p.m. He was inside the Capital building less than 5 minutes!

    Mr. Dale recognizes the events of January 6th should not be minimized but his participation was non-violent, limited and finite. While the wooden marker was damaged, there is no evidence the damage led to others making entry into the Capital and no law enforcement officers were threatened or assaulted. Mr. Dale did not enter any offices or take any property. Mr. Dale did not bring any weapons with him and had no connection to extremist groups. He spent approximately 5 minutes inside the capital and when he was instructed by law enforcement to exit the capital, he fully complied and left the capitol grounds without incident.

    Mr. Dale takes full responsibility for his actions on January 6th. He regrets that he allowed himself to get caught up in the moment and step over the line between legal protest and illegal demonstration. He respectfully asks this court for the opportunity to show that he can be a successful probationer out of this court and is confident that conduct like this will not happen again.

### **UNWARRANTED SENTENCTING DISPARITIES**

The Court must evaluate Mr. Dale's actions on January 6th in the same manner as it does the actions of similarly charged defendants. In, *United States v. Hunter Ehmke*, 21-cr-29, Mr. Ehmke jumped up onto a window ledge of a window that has multiple panes and leads to an office inside the building. Ehmke, using his right foot, kicked-in the three lower panes of the window, shattering them. Then, using his right fist, Ehmke smashed two additional windowpanes. Ehmke was tackled by officers of the United States Capitol Police, who detained him on the ground of the Capitol Terrace below the window. Ehmke plead guilty to a felony violation of 18 U.S.C. § 1361 and was sentenced to four months of incarceration, to be followed by three years of supervised release.

In *United States v. Troy Faulkner,* 21-cr-126, Mr. Faulkner admitted that he unlawfully kicked in and broke a window at the U.S. Capitol and jumped up onto a window ledge that has multiple panes and lead to inside the U. S. Capitol Building. Faulkner admitted using his left foot to kick-in two lower panes of the window, shattering them. Mr. Faulkner plead guilty to a felony violation of 18 U.S.C. § 1361 and was sentenced to five months of incarceration, to be followed by three years of supervised release.

While the government cites concerns about Mr. Dale's conduct on pretrial release these last approximately 2 months have driven home the seriousness of his offense and harm, he has caused himself and his family. He understands that the terms and conditions of the court most take precedence over his work schedule and is determined to comply with any and all conditions the court deems appropriate.

As clearly demonstrated in paragraph 37 and paragraph 46, Mr. Dale has accepted full responsibility for his actions[2]. He sincerely regrets his actions on January 6, and desperately wishes he could reverse them. With that not being an option he is determined to provide for his family and not put them in any further harm moving forward.

### **HISTORY AND CHARCATERISTICS OF JOSHUA RYAN DALE:**

Joshua Ryan Dale was born on May 4, 1991, and spent most of his life in North Carolina. Due to his parent's toxic relationship and their inability to financially care for Mr. Dale, he was primarily raised by his grandparents. Mr. Dale learned, at a young age, the only person he could count on to take care of himself was him. He learned a trade and became a talented, skilled and sought-after tile installer. He prides himself on his craftmanship and hard work ethic, but that work ethic also came at a price. When pushed to finish deadlines and large job assignments, Mr. Dale turned to drugs to maintain a harrowing work pace. Previous unresolved trauma and undiagnosed ADHD, also fed into his periodic drug use.

During his adolescence, Mr. Dale's best friend drowned in front of him. The two were cliff diving at the lake and, despite Mr. Dale's efforts to save him, his friend drown. More recently, in May 2024, Mr. Dale's sister, Ashleigh Dale, was accidentally shot and killed. Ashleigh was sitting in a car, with friends, including her neighbor. The neighbor was in the back seat and was working with an older gun when the gun discharged and went through the front seat, hitting and killing Ashleigh. His sister's death happened while Mr. Dale was on pretrial release and while her death contributed to his negative attitude and behaviors, it is not

---

[2] Defense counsel advised Mr. Dale and informed U.S. Probation Officer De La Riva that Mr. Dale would be standing on the statement of facts outlined in the plea agreement and would not be making additional statements. Counsel would respectfully request the court not take any inference by the lack of "further comment" of Mr. Dale regarding acceptance of responsibility or remorse for his actions. Mr. Dale was following the directive of defense counsel during the Presentence interview.

an excuse. Mr. Dale recognizes he must do a better job dealing with his mental health and has taken steps to do so.

Simply stated, Mr. Dale wants to get back to work and support his family. In 2021, Mr. Dale and his wife, Kayla, left North Carolina for East Tennessee. They wanted a new start for their family and a better living situation for their son. Mr. Dale ran a prosperous tile business and was the primary breadwinner but due to his incarceration, his family has suffered. Mr. Dale understands that his actions have caused the greatest pain to his family. He feels a deep responsibility to stay sober, address his mental health issues, and continue to be a hard-working, loving family man.

## **CONCLUSION:**

Based on the above, a sentence of time served, and a reasonable period of supervised release would be sufficient but not greater than necessary to achieve the sentencing purposes set forth in 18 U.S.C. §3553(a).

Respectfully submitted this 13th day of December 2024.

FEDERAL DEFENDER SERVICES
OF EASTERN TENNESSEE, INC.

BY:  *s/ Benjamin G. Sharp*
Benjamin G. Sharp, VSB#47398
Assistant Federal Defender
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
(865) 637-7979